# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| SHALISHA POTTS, SHAWNTAE MCGUIRE, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| BUY BUY BABY, INC., | ) ) |
| Defendant. | ) ) |

Case No. 4:18-00969-CV-RK

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Buy Buy Baby, Inc.'s motion for summary judgment. (Doc. 43.) Plaintiffs allege they were targeted as potential shoplifters and were followed around at one of Defendant's stores because of their race in violation of the Missouri Human Rights Act ("MHRA"). Defendant seeks summary judgment against these claims. After careful consideration, the Court finds there are genuine issues of material fact for trial. Accordingly, and for the reasons below, the motion is **DENIED.**

## Background

The following facts are taken from the parties' statements of uncontroverted material facts and are drawn in the light most favorable to Plaintiffs. (Docs. 51, 54.) Defendant is a baby merchandise retailer that sells clothing and other items for babies and children. In Defendant's Independence, Missouri store, employees identify suspicious shoppers over the radio by naming them "Bonnies."[1] Customers are identified as Bonnies if a store employee identifies them as problem customers, which occurs approximately every other week. When a customer is deemed a Bonnie, employees are instructed to "provide excellent customer service." According to the deposition testimony of Quinton Bunyar, who was the store's supervisor on the night in question, "the idea was if you give [shoplifters] a lot of customer service, they would get annoyed and they would just leave." (Doc. 44-5, Bunyar Depo. at 14:4-6.)

Plaintiffs Shawntae McGuire and Shalisha Potts are black women. They are also sisters. Ms. McGuire considered herself a frequent shopper at the Independence store location. She

---

[1] This is presumably in reference to "Bonnie and Clyde," the infamous 1930s bank robbers.

testified during her deposition that, every time she came to this store prior to January 14, 2018, she was followed by employees. On January 14, 2018, Plaintiffs entered the Defendant's Independence store, along with Ms. Potts' minor son, so Ms. McGuire could buy clothes for her small daughters. Ms. McGuire was browsing through the store, and Ms. Potts was talking on her cell phone. An employee by the name of Cilla Fletcher identified Plaintiffs as Bonnies—meaning they were suspicious and possible shoplifters—by announcing over the radio, "Do we have some Bonnies in the store?"

Both Ms. Potts and Ms. McGuire felt they were being followed. Ms. McGuire confronted the employee she felt was following her, Adrine Daldalian, and asked her why she was doing so. In response, Ms. McGuire recalls Daldalian stating something to the effect of: "Please don't record me. I'm just doing what they told me to do." Ms. McGuire then spoke with the manager on duty, Mr. Bunyar, and asked him why Plaintiffs were being followed. Mr. Bunyar responded that Plaintiffs were suspicious because they had big purses and were wearing big coats.[2] Ms. McGuire then asked Mr. Bunyar why the two Caucasian women who were checking out at the time were not also followed, and he responded that he "didn't have any suspicion" of them. (Doc. 51-6 at 6; Exhibit 6, Video.) Ms. McGuire pointed out to Mr. Bunyar that the two Caucasian women also had a large purse and that one was wearing a large poncho. (Doc. 51-6 at 5-6; Exhibit 6, Video.) Ms. McGuire later testified during her deposition that both of the white women had oversized bags and also coats. (Doc. 44-4 at 56, McGuire Depo. at 54:22-24.) Both the purse and the poncho are visible in the video that has been submitted to chambers, and the purse appears to be comparable in size to Ms. McGuire's. (Exhibit 6, Video at 2:31, 7:24.) After a lengthy discussion, Ms. McGuire paid for her items, and Plaintiffs left the store.[3]

---

[2] The parties agree this was Mr. Bunyar's response, despite the slightly different response reflected in the transcript of the video that has been submitted to chambers. The Court deems Defendant's admission as true for purposes of ruling on its motion summary judgment. (*Compare* Doc. 54 at 14 ¶ 22 (uncontroverted that "Quinton replied they had big purses and were wearing big coats"), *with* Doc. 56-1, Video Tr. at 4:44 ("It was suspicion because you had a lot of clothing in your hand and you were looking around. And, so . . . you had a big purse that appeared to be empty.").)

[3] Defendant argues that "Plaintiffs cannot cite to any materials in the record which would support their speculation as to the race of [the other] customers." (Doc. 54 at 13 ¶ 14.) Defendant's argument borders on frivolous. Plaintiffs have cited the deposition testimony of a cashier, Heather Ferneau, who testified that she checked out two white customers at the same time Plaintiffs were checking out, and that the other two customers were not identified as potential Bonnies. (Doc. 51-7 at 4, Ferneau Depo. at 6-7.) Plaintiffs also testified during their depositions that the other two customers

Plaintiffs filed charges of race discrimination with the Missouri Commission on Human Rights and two separate lawsuits in state court for violations of the MHRA. Defendant removed both lawsuits to this Court on the basis of diversity jurisdiction. Upon joint motion of the parties, the cases have been consolidated. (Doc. 19.) Although the Complaint was amended to include claims under 42 U.S.C. § 1981, Plaintiffs have withdrawn those claims and consented to their dismissal. Accordingly, the only issue before the Court is whether Defendant is entitled to summary judgment on Plaintiffs' MHRA race discrimination claims. Defendant's motion for summary judgment is fully briefed and ready for decision. (Docs. 44, 51, 54.)

## Subject-Matter Jurisdiction

The Court has diversity jurisdiction. 28 U.S.C. § 1332. At all relevant times, Plaintiffs were citizens of Missouri, and Defendant was a citizen of Delaware (its place of incorporation) and New Jersey (where it has its principal place of business). (Doc. 1.) The amount in controversy exceeds $75,000, given the undisputed facts at issue and the potential for recovery of compensatory damages, punitive damages, and attorneys' fees under the MHRA.

## Legal Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted).

## Discussion

The Missouri statute prohibiting discrimination in public accommodations states as follows, in relevant part:

> 1. All persons within the jurisdiction of the state of Missouri are free and equal and shall be entitled to the full and equal use and enjoyment within this state of any place of public accommodation, as hereinafter defined, without discrimination or segregation because of race, color, religion, national origin, sex, ancestry, or disability.

---

were white. (Doc. 44-4 at 56, McGuire Depo. at 54:18-24; Doc. 44-3 at 42, Potts Depo. at 40:1-6.) Moreover, the other two customers' hands are visible in the video submitted to chambers, and they appear to have fair skin. (Exhibit 6, Video at 7:24.)

3

> 2. It is an unlawful discriminatory practice for any person, directly or indirectly, to refuse, withhold from or deny any other person, or to attempt to refuse, withhold from or deny any other person, any of the accommodations, advantages, facilities, services, or privileges made available in any place of public accommodation, as defined in section 213.010 and this section, or to segregate or discriminate against any such person in the use thereof because of race, color, religion, national origin, sex, ancestry, or disability.

Mo. Rev. Stat. § 213.065.1, .2. The elements of a claim under § 213.065 are: (1) the plaintiff is a member of a class protected by § 213.065; (2) the plaintiff was discriminated against in the use of a public accommodation (as defined by § 213.010); and (3) the plaintiff's status as a member of a protected class was a motivating factor in that discrimination.[4] *R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 424-25 & n.3 (Mo. banc 2019). Here, the parties do not dispute that Plaintiffs are members of a class protected by § 213.065, or that Defendant's Independence store was a place of public accommodation under § 213.010.

Defendant argues that Plaintiffs cannot meet the second element of their claims because they were allowed to shop, purchase items from the Independence store, speak to a manager, leave freely, and return later. Defendant contends this means they were not denied "any of the accommodations, advantages, facilities, services, or privileges made available." The Court disagrees. If Defendant were correct, Plaintiffs could not prove a claim under § 213.065 as long as they were allowed to check out, even if they were targeted and followed around the Independence store because of their race. The Court does not believe the Supreme Court of Missouri would interpret § 213.065 this way. In diversity cases brought under Missouri law, the Court attempts to forecast how the Supreme Court of Missouri would decide the issues presented. *Brown v. CRST Malone, Inc.*, 739 F.3d 384, 390 (8th Cir. 2014). The primary rule of statutory interpretation in Missouri "is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Karney v. Dep't of Labor & Indus. Relations*, ___ S.W.3d ___, No. SC97833, 2020 WL 1527084, at *2 (Mo. banc Mar. 31, 2020). The text of § 213.065 states that it is unlawful to deny anyone the "accommodations, advantages, facilities, services, or privileges made available in any place of public accommodation" because of their race. This plainly includes

---

[4] The "motivating factor" standard applies here, rather than the old "contributing factor" standard that was arguably still in effect in *R.M.A.*. Unlike in *R.M.A.*, the statutory amendment that changed this standard went into effect prior to any of the events at issue in this case, in 2017.

the ability to shop without being labeled a "Bonnie" and followed around a store because of a person's race.[5]

Defendant next argues that Plaintiffs cannot meet the third element of a claim under § 213.065 because its employees were motivated by something other than race. Defendant contends that "Plaintiffs' only evidence of alleged race discrimination is the fact that two white women were also in the store." (Doc. 44 at 10.) This is a mischaracterization of the evidence that has been submitted. Defendant states that its employees' actions were "in response to [Ms. McGuire's] large coat and bag." (Doc. 44 at 10.) However, Ms. McGuire stated in her deposition that both of the white customers had oversized bags and also coats, and she observed when speaking with Mr. Bunyar that one of these customers had a large poncho and a large purse. Both the purse and the poncho are visible in the video that has been submitted to chambers, and the purse appears to be comparable in size to Ms. McGuire's. (Exhibit 6, Video at 2:31, 7:24.) Nonetheless, Mr. Bunyar confirmed that the two white customers were not followed because they were not viewed as suspicious, and the cashier who was checking them out, Ms. Ferneau, confirmed that they were not labeled "Bonnies." This is sufficient evidence to show there is a genuine issue of fact for the jury about whether Defendant's employees were motivated by Defendant's stated reasons, or whether Plaintiffs' race was a motivating factor.

Finally, Defendant argues that Plaintiffs admitted during their depositions that they have not suffered any damages. The Court disagrees. The fact that Plaintiffs did not provide counsel a satisfactory answer about what specific monetary value they place on their case is not an admission that they have no damages. Nor does the fact that Ms. McGuire returned to the same store twice definitively show that she suffered no harm. Under Missouri law, a civil rights plaintiff may recover damages for humiliation and other "garden variety" emotional distress. *See State ex rel. Dean v. Cunningham*, 182 SW 3d 561, 567 (Mo. banc 2006) ("Injuries caused by

---

[5] The text of § 213.065 is different from that of 42 U.S.C. § 1981, which protects equal rights to "make and enforce contracts." Under § 1981, "a plaintiff must show that the retailer thwarted the shopper's attempt to make a contract;" "[a]n allegation of discriminatory surveillance is insufficient . . . ." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 471 (8th Cir. 2009) (en banc) (quotation marks and citations omitted). Unlike § 1981, the text of § 213.065 does not limit its protection to contractual rights. *Cf. Keeney v. Hereford Concrete Prod., Inc.*, 911 S.W.2d 622, 624 (Mo. banc 1995) (interpreting a Missouri statute prohibiting employment discrimination more broadly than an analogous federal statute because it was "immediately obvious that the language employed by the Congress . . . [wa]s considerably more limited than the exceedingly broad . . . language adopted by the Missouri legislature"). Rather, § 213.065 is more akin to the federal prohibitions on discrimination in public accommodations contained in 42 U.S.C. § 2000a.

5

deprivations of civil rights differ from most other tort claims. They are not part of a claim based upon physical injury. Damages for humiliation and emotional distress in civil rights cases . . . may be established by testimony or inferred from the circumstances.") (quotation marks and citations omitted).

Ms. McGuire testified during her deposition that, although she has not "lost any money," she felt degraded, mistreated, neglected, and harassed by being stalked numerous times, and that the incident had an impact on her relationship with her children, who are biracial and fair skinned. (Doc. 44-4 at 41-43, 65, 67-73, McGuire Depo. at 39:10-41:5, 63:6-16, 65:19-71:18.) Ms. Potts testified that she felt "belittled as a black woman" and had to miss work to meet with her son's school counselor because he was having trouble with race relations as a direct result of his presence during the incident. (Doc. 44-3 at 80-88, Potts Depo. at 78:16-86:10.) This is sufficient to show there is a genuine factual dispute for the jury about whether and to what extent Plaintiffs were damaged.[6]

Therefore, Defendant has failed to show that it is entitled to summary judgment.

## Conclusion

Accordingly, the Court **ORDERS** as follows:

1. Count II of the Amended Complaint, which Plaintiffs have withdrawn, is **DISMISSED.**
2. Defendant's motion for summary judgment (Doc. 43) is **DENIED.**

**IT IS SO ORDERED.**

                                                    s/ Roseann A. Ketchmark
                                                    ROSEANN A. KETCHMARK, JUDGE
                                                    UNITED STATES DISTRICT COURT

DATED: May 28, 2020

---

[6] Plaintiffs' deposition testimony is sufficient to show a genuine dispute on the damages issue, so the Court need not resort to the declarations Plaintiffs have submitted in opposition to summary judgment. (Docs. 51-1, 51-2.) Regardless, the Court is not persuaded by Defendant's argument these are "sham" declarations that somehow conflict with Plaintiffs' prior deposition testimony. Defendants have failed to articulate how there is any conflict. Upon review, the declarations seem to simply elaborate and provide further detail about the garden variety emotional distress damages Plaintiffs discussed during their depositions (aside from Ms. Potts' new assertion that this incident affected her pregnancy).